IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PORT OF CORPUS CHRISTI AUTHORITY OF NUECES COUNTY, TEXAS | § § § § § | |
| Plaintiff | § | Civil Action No. _____ |
| v. | § | |
| THE PORT OF CORPUS CHRISTI, LP and KENNETH BERRY | § § | |
| Defendants | § | Jury Demanded |

## NOTICE OF REMOVAL OF A CIVIL ACTION

TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS DIVISION

NOW COME DEFENDANTS The Port of Texas, L.P.,[1] (sometimes "*TPT*" or the "*Entity Defendant*") and Kenneth Berry (herein sometimes collectively the "*Defendants*") and file this notice of removal of the case styled *Port of Corpus Christi Authority of Nueces County, Texas, vs. The Port of Corpus Christi, LP*, Cause No. 2018-CCV-60780-4, in the County Court at Law, No. 4, Nueces County Texas, timely removing this case from County Court at Law No. 4, Nueces County, to the United States District Court for the Southern District of Texas, Corpus Division pursuant to 28 U.S.C. §1441 (c).

## I.
### INTRODUCTION AND OVERVIEW OF GROUNDS FOR REMOVAL

1.  From the time this case was originally filed by the Port of Corpus Christi Authority of Nueces County, Texas ("*POCC*" or the "*Port Authority*") in April 2018, its complaint has only

---

[1] The Port of Texas, LP was formerly named The Port of Corpus Christi, L.P. but through the Secretary of State's office has formally changed its name, and abandoned its use, as the Plaintiff well knows and has even pleaded. See, Plaintiff's Second Amended Petition, attached hereto as Exhibit B, ¶ 40.

been about the fact that in 2014 the Entity Defendant filed a Certificate of Formation with the Texas Secretary of State organizing under a name that the POCC, a governmental navigation district, claimed "unfairly competed" with them.  See, e.g., Pet. ¶ 25.

2.      Aside from the irony of a governmental entity claiming competitive harm from a small private business, two things are clear: (1) the Entity Defendant has long since changed its name that so upset the Plaintiff and has abandoned its use; [Pet. ¶ 40] and (2) POCC, as the plaintiff, has done absolutely nothing to prosecute its trademark claims.  This changed on Friday, February 11, 2022, when the POCC amended its petition to assert what are clearly new, federal claims having no relationship to the initial trade name allegations.[2]  Given that the petition filed by the Plaintiff even acknowledged that the Entity Defendant has long ago changed its name and abandoned the use complained of, [Pet. ¶ 40]  and the recent amendments to the petition asserting new federal claims, removal of this case is timely.[3]

3.      Pursuant to 28 U.S.C. §1446(a) Defendants are filing a copy of all process, pleadings, and orders served by and upon them in this action. Due to their size, an index only of those documents is attached hereto as Exhibit A, and a supplement adding all the copies of all pleadings referenced on Exhibit "A" will be filed as soon as practical.  [4] As it is recently filed and

---

[2]      Illustrating the clear abandonment of any prosecution of the original complaint, the Second Amended Petition was filed almost four years after the initial petition during which time Plaintiff never obtain a single pre-trial order setting any deadlines for amendment to pleading or even a trial.

[3]      *Braud v. Transp. Serv. Co.,* 445 F.3d 801, 802 (5th Cir. 2006):

If the complaint is amended, however, § 1446(b), para. 2 provides that the new defendant has a new window to remove as of the date of receipt of service of the amended complaint: If the case stated by the initial pleading is not removable, a petition for removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable. 28 U.S.C.S. § 1446(b).

[4] The underlying records are voluminous but largely irrelevant.  Defendants had filed significant counterclaims which were dismissed on claims of sovereign immunity.  An appeal was taken to the Thirteenth Court of Appeals, which court dismissed some claims as moot; reversed and remanded other claims; and sustained the governmental immunity

particularly relevant to this removal, the Plaintiff's recently filed Second Amended Petition is attached hereto separately as Exhibit "B."

4.      Defendant Kenneth Berry has not yet been served but consents to and joins in this removal for all purposes, reserving his rights to respond to not only the Second Amended Petition filed by the Plaintiff within the last few days, but also by all appropriate pleadings in this Court including all pleadings allowed by Rule 12(b).

5.      Pursuant to 28 U.S.C. §1446(d), undersigned counsel certifies that, promptly after the filing of this Notice of Removal, a Notice of Removal will be filed with the Clerk of the County Court at Law #4 for Nueces County, Texas to effect the removal of the state court case and will further be served on all opposing counsel.

6.      The facts of this case are very similar to *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.,* 850 F.3d 714, 720 (5th Cir. 2017) (which case is hereafter referred to as "*Bd. of Commissioners*") where the removal of a state case to the federal courts was approved.  In *Bd. of Commissioners* the Flood Protection Authority, whose authority covered flood protection, filed a state court suit claiming that the dredging activity of the defendants there had caused land loss, increased erosion, and the submergence of a coastal "buffer zone."  *Bd. of Commissioners*, 850 F.3d at 720.  The Flood Protection Authority cast their claims in pure state law terms (e.g., negligence, strict liability, nuisance, and breach of contract; *Id*.) and, as the Fifth Circuit stated, "[n]one of the individual claims relies on a cause of action created under federal law, and the negligence, strict liability, and natural servitude claims explicitly rely on state law causes of action."  *Id*. at 721.  Nevertheless, the Fifth Circuit upheld the removal in its *de novo* review for several reasons, chief among them

---

claims on others. *See, Port of Corpus Christi, LP v. Port of Corpus Christi Auth. of Nueces Cty*., No. 13-19-00378-CV, 2021 Tex. App. LEXIS 5249, at *1 (Tex. App.—Corpus Christi July 1, 2021).   Defendants thereafter nonsuited the remaining claims without prejudice.

was the fact that in state court the plaintiff there challenged the defendants' dredging activities which were held by the Fifth Circuit to be "subject to an extensive federal permitting scheme" promulgated and overseen by the United States Army Corps of Engineers (hereafter, the "Army Corps") thus making the case primarily about federal issues. Precisely the same issues and legal points are present here.

7. In *Bd. of Commissioners*, the Fifth Circuit even quoted the same provisions of the Rivers and Harbors Act of 1989, 33 U.S.C. §§ 401-467, applicable here, i.e., those that specifically instruct the Army Corp to oversee and implement this "extensive federal permitting scheme" concerning dredging and activities related thereto. That extensive federal permitting scheme there implicated by the plaintiffs' claims concerned dredging and it is applicable here for precisely the same reasons. *Bd. of Commissioners*, 850 F.3d at, 724 n.24.

8. Furthermore, however, here the POCC makes claims that go well beyond those that gave rise to removal in *Bd. of Commissioners*. Specifically, the new state court Second Amended Petition asserts that: [5]

- the Defendants here own and operate a federally regulated and permitted Dredge Placement Area (or "*DMPA*") [Pet. ¶46] (as explained below, ownership and operation of a DMPA is subject to the extensive federal permitting scheme referenced in *Bd. of Commissioners*);

- as a result of the ownership and operation of the federally permitted DMPA and its operation precisely as contemplated by the Army Corps in its approval permitting, there have been "discharges" into the navigable waters of the Corpus Christi Bay. Pet. ¶46; and

- that "on information and belief, Defendant Berry has contracted with a third party by which he will allow the third party to place hundreds of thousands of cubic yards of new dredge spoil and other materials on Berry Island's DMPA." Pet. ¶49. This allegation presumably references the Army Corps permit attached hereto as Exhibit C, where after extensive public notice, comment and evaluation, the Army Corps

---

[5] Defendants will reference allegations in the Second Amended Petition but do so with the express caveat that Defendants are making no admissions as to the accuracy of those allegations. Rather, they are refenced solely to highlight what the Plaintiff has alleged.

issued its dredging permit expressly stating that "**All dredged material will be placed on Berry Island.**" *See* Ex. 3, p. 16-17.

9.     In summary, the Plaintiff's petition is an indirect, collateral attack on the entire Army Corps permitting regimen.  Indeed, the Plaintiff's claims here are far more expansive than those in *Bd. of Commissioners*.  Substantial federal questions not only abound, they control the resolution of this case, defining duties owed and conduct permitted.

10.     Furthermore, in *Bd. of Commissioners*, the Fifth Circuit held that even though the plaintiffs' claims there did not technically assert a federal cause of action, nevertheless, "the implications for the federal regulatory scheme of the sort of holding that the Board seeks would be significant, and thus the [federal] issues are substantial." *Bd. of Comm'rs.*, 850 F.3d 724. Removal was therefore proper.  This reinforces the well-known doctrine that the court looks beyond the technical words used in a petition/complaint being removed to examine the gravamen.[6]

11.     In summary and as more fully set forth hereafter, this case is removable for the following reasons:

      a.     A significant and substantial component of Plaintiff's state law claims requires the interpretation of federal law, and Plaintiff's right to relief depends upon resolution

---

[6]     *Bd. Of Comm'rs.*, at 721: ["A federal question exists only where ***a well-pleaded complaint*** establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  citing *Singh v. Duane Morris LLP, 538 F.3d 334, 337-38 (5th Cir. 2008)* (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983))*"];

See also *Iwag v. Geisel Compania Maritima, S.A.,* 882 F. Supp. 597, 604 n.5 (S.D. Tx 1995):

The artful pleading doctrine constitutes a general exception to the well-pleaded complaint rule in that the district court may seek to ascertain whether the plaintiff's claim is truly federal in nature. *In re Carter,* 618 F.2d 1093, 1101 (5th Cir. 1980); *Brown v. Crop Hail Management,* 813 F. Supp. 519, 522 (S.D. Tex. 1993). The court may properly examine the plaintiffs motives for excluding a federal cause of action if the suit has no federal question on its face. *Aaron,* 876 F.2d at 1164-65; *Brown,* 813 F. Supp. at 522. "If the court concludes that the plaintiff's failure to plead her federal claim was not in good faith, but rather was an attempt to conceal the fact that her claim was truly federal, the court will allow the removal." *Aaron,* 876 F.2d at 1161. *See also Messina v. Tri-Gas, Inc.,* 816 F. Supp. 1163, 1166 (S.D. Tex. 1993); *Brown,* 813 F. Supp. at 522.

of substantial questions of federal law, and therefore, federal question jurisdiction applies. Without limitation, this includes the following facts

    i.    Plaintiff's complaint is that the Army Corps has permitted the very conduct about which Plaintiff complains;

    ii.    Plaintiff's complaint that Defendants' alleged DMPA will "necessarily result" in increased sandbars in the navigable waters of the Corpus Ship Channel, addresses issues arising in the navigable waters over which the Army Corps has exclusive jurisdiction;

    iii.    Plaintiff's complaint that the placement and anchoring of dredge pipe by others over submerged land leading to the Defendants' location is illegal and must be removed [Pet. ¶ 52], are actions that have not only been specifically approved by the Army Corps, the Army Corps itself determined the location and must approve any movement of those pipelines; and

    iv.    Plaintiff's claims that damages must be paid to "restore the [submerged] property to is prior state" will necessarily require activities and actions in the navigable waters over which the Army Corps has explicit and sole authority to approve or not as it chooses.

12.    A significant and substantial component of Plaintiff's state law claims are based on Defendants' compliance with federal law because if injunctions are issued, those in turn will themselves conflict with if not violate federal law, thus giving rise to federal question jurisdiction.

13.    A significant and substantial component of Plaintiff's state law claims are based on and relate to the Rivers and Harbors Act of 1989, 33 U.S.C. §§ 401-467; the Clean Water Act of 1972, 33 U.S.C. §§ 1251-1388; as well as a veritable avalanche of comprehensive federal

regulations that empower the Army Corps thereunder, which regulations include acknowledgement that:

    a.  Tasks undertaken by the Army Corps at issue here have as their "primary thrust" the Army Corps' regulatory program for the protection of navigation, "which reflects the national concerns for both the protection and utilization of important resources."  33 C.F.R. § 320.1. Thus, the matters addressed in Plaintiff's petition are of the highest national priority.

    b.  The Army Corps has complete control over all dredging and the deposit of dredge spoils associated therewith specifically stating in 33 C.F.R. § 320.2(f) :

> (f)  Section 404 of the Clean Water Act … authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits, after notice and opportunity for public hearing, **for the discharge of dredged or fill material into the waters of the United States at specified disposal sites…**. **The selection and use of disposal sites will be in accordance with guidelines developed by the Administrator of EPA in conjunction with the Secretary of the Army** …. If these guidelines prohibit the selection or use of a disposal site, the Chief of Engineers shall consider the economic impact on navigation and anchorage of such a prohibition in reaching his decision. Furthermore, the Administrator can deny, prohibit, restrict or withdraw the use of any defined area as a disposal site whenever he determines, after notice and opportunity for public hearing and after consultation with the Secretary of the Army, that the discharge of such materials into such areas will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreational areas.

    c.  Other provisions of the Code of Federal Register reflect the fact that the Army Corps has complete control over all dredging and deposit of dredge spoils associated therewith, including;

        • 33 C.F.R. § 321.1- 321.3 dealing with permits for dams and dikes in navigable waters;

- 33 C.F.R. § 322.1 – 322.5 dealing with permits for structures and work in or affecting navigable waters the Army Corps must issue;

- 33 C.F.R. § 323.1-323.6 permits for discharges of dredged or fill materials into the waters of the United States the Army Corps must issue; and

- 33 C.F.R. § 324.1-324.4 dealing with permits for ocean dumping of dredged materials the Army Corps must issue.

14.     A significant and substantial component of Plaintiff's state law claims arise under federal law in that 33 C.F.R. §326 gives the Army Corps the exclusive right and authority to investigate and prosecute all activities undertaken in contravention to a permit.

15.     As regards the acts and actions about which Plaintiff complains, the Army Corps has exclusive jurisdiction completely preempting the field.

16.     Plaintiff asserts a general maritime claim, and 28 U.S.C. § 1441(b) makes such claims removable.

## II.
## THE COMPREHENSIVE REGULATORY FRAMEWORK FOR DREDGING AND DEPOSIT OF DREDGE SPOILS AND PLAINTIFF'S PETITION

### A. PLAINTIFF HAS "ARTFULLY PLEADED CLAIMS" IN AN INAPPROPRIATE ATTEMPT TO OBSCURE THE FEDERAL QUESTIONS

17.     As noted above, district court may exercise original federal jurisdiction over any civil action "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Under Section 1331, federal jurisdiction is present when a plaintiff's well-pleaded complaint demonstrates that (a) "federal law creates [one or more] cause[s] of action" alleged by plaintiff or (b) "plaintiff's right to relief [under one or more causes of action] necessarily depends on resolution of a substantial question of federal law." *Singh v. Duane Morris LLP*, 538 F.3d 334, 337-38 (5th Cir. 2008). "A single claim over which federal-question jurisdiction exists is sufficient to allow

removal." *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 194 (2d Cir. 2005). In this case, federal jurisdiction is present under both of the foregoing grounds.

18.      Irrespective of the wording Plaintiff used in its Petition, for federal jurisdiction purposes, this Court may not take Plaintiff's allegations at face value and must instead undertake a careful examination of the facts and legal theories giving rise to those claims. *See, e.g., Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th Cir. 1997) ("A federal court may find that a plaintiff's claims arise under federal law even though the plaintiff has not characterized them as federal claims."); *Hawkins v. Nat'l Ass'n of Sec. Dealers Inc.*, 149 F.3d 330, 332 (5th Cir. 1998) (finding federal question jurisdiction where "[plaintiff's] claims ... , though carefully articulated in terms of state law, [were] actions at law seeking to enforce liabilities or duties created by federal securities laws"). When that is done, there is no question that Plaintiff's claims are created by, or necessarily require the resolution of disputed issues of, federal laws and regulations.

### B.  THE COMPREHENSIVE REGULATION OF DREDGING, DREDGE SPOILS AND DMPA'S

19.      In general terms, dredging pumps suction the subsurface bottom of targeted navigable waters. What is removed is called dredge spoil. Suctioned dredge spoil moves usually via submerged pipes located on the bottom of the navigable seabed to an inland location, where it is deposited in an area called a Dredge Material Placement Area (or DMPA). A DMPA is essentially an area with elevated, dam-like berms that hold the dredge spoil. There the dredge spoil sits, allowing the solid portion to settle to the bottom and the cleaner waters to rise to the surface where it is decanted back into the body of water from which it came. The solids or former subsurface from one location, has thus effectively been moved onto the surface in another location. Here is a sample of the inside of a typical DMPA, with a "weir" through which decanted water

that has risen to the top (while solids settle to the bottom) runs back into the body of water from which it was taken:



20.     Boards are placed around the sides of the weir to control the level of dredge spoil and control its leaving the DMPA. By their design, as approved by the Army Corps, DMPA's by definition contemplate the discharge of decanted, clear water back into the navigable waters of the Bay through piping connected to the weir as illustrated by the picture found at Pet. ¶ 48:



21.     The Rivers and Harbors Act of 1899 ("RHA") grants the U.S. Army Corps of Engineers (previously, the "Army Corps") the exclusive authority to control and regulate by permit all facets of this activity, particularly in so far as it is conducted in the navigable waters of the United States. All facets -- dredging, transport of dredge spoils, as well as the engineering design/operation of DMPA's and discharge back into the navigable waters -- are under the exclusive oversight and control of the Army Corps.  In conjunction with this grant of exclusive authority, the RHA prohibits both the unauthorized alteration of or injury to the facilities once they have approved.  The Clean Water Act of 1972 ("CWA") supplemented and extended the Army Corps' permitting authority, particularly in CWA § 404 and related regulations. See 33 U.S.C. § 1344(a).

22.     Pursuant to the broad grant of exclusive authority to grant permits to dredge and transport dredge spoil, and most relevant here construct and operate a DMPA, the Army Corps has promulgated and published a comprehensive set of regulations which must be complied with and those regulations define the standards of care associated with the operation of a DMPA. See, e.g., 33 C.F.R. § 320-325 (giving the Army Corps the exclusive task of approving through permits, the location and construction of DMPA's).   Anyone wishing to construct and operate a DMPA is directed to the standard application requirements found starting at 33 C.F.R. § 325.  Detailed drawings and plans regarding the DMPA's into which the dredge spoils will be transported are required to be presented to the Army Corps. 33 C.F.R. § 325.1 (d)(3).  DMPA's – also called "impounding structures – are required to be demonstrated to the satisfaction of the Army Corps to have been constructed in compliance with established safety criteria and by qualified persons.  33 C.F.R. § 325.1 (d)(6).

23.    Another term the Army Corps employs for a DMPA is a "confined disposal facility" or "CDF." The Army Corps in one of its many detailed explanations of its requirements states the following:[7]



4.1.1.3 A true upland CDF allows for all dredged material fill to be placed above the water table. CDFs constructed in water may become upland sites once the fill reaches elevations above the mean high water elevation. Upland CDFs are not solid waste landfills. They are designed and constructed specifically for placement of dredged material and normally have a return flow as effluent to United States waters. A typical upland CDF is shown in Figure 4-3.

Figure 4-3. Typical Upland CDF

24.    As the highlighted portion above shows, DMPA's are normally permitted for the explicit purpose of discharging the resulting effluent back into US waters, which here is the Corpus Christi Ship Channel.

25.    33 C.F.R. § 325.2 details the assignment by the Army Corps of a district engineer to supervise each application as well as the review and public notices that the Army Corp requires for each such application. If the Army Corps district engineer determines that water quality of the discharge from a DMPA warrants further review under CWA §401, then the state agency in charge

---

[7] US Army Corps of Engineers, ENGINEERING AND DESIGN, DREDGING AND DREDGED MATERIAL MANAGEMENT, JULY 31, 2015, EM 1110-2-5025.

of water quality – here the TCEQ – is notified and the TCEQ's results along with those of the EPA are presented to the district engineer who has the sole discretion to determine whether the DMPA will operate in compliance with applicable water quality requirements. 33 C.F.R. § 325.2(b)(1). The specifics of all public notices are set forth in 33 C.F.R. § 325.3, which are very detailed. The form of permit that the Army Corps issues after extensive and exhaustive analysis and public comment, is found at 33 C.F.R. § 325 Appendix A, which requires, among other things, the precise location of where disposals will occur to be stated and a requirement that the DMPA will be maintained "in good condition and in conformance with the terms and conditions of this permit." Once approved, DMPA's cannot be changed or abandoned without explicit Army Corps approvals.

26.    The Army Corps engages in top to bottom design analysis of DMPA's as the following excerpt from Army Corps permit guidelines demonstrates:[8]

> 4.1.1.7 Design objectives.
>
>    a. The objectives inherent in design and operation of CDFs are to provide for adequate storage capacity for meeting dredging requirements and to maximize efficiency in retaining the solids. CDFs are often considered as a disposal alternative for materials found to be unsuitable for open-water placement. Control of contaminant releases is a design and operation objective for these projects.
>
>    b. A principal design criterion of CDFs is to retain as high a percentage of the fine-grained sediment particles as is practicable. This principle is based on the findings of the USACE Dredged Material Research Program (DMRP), which demonstrated that most chemical contaminants associated with sediments could be contained effectively through efficient solids containment. Since most contaminants in sediment remain attached to solid particles during dredging and placement in the CDF, this process is reasonably efficient for containment of contaminants.

27.    And the Army Corps dredging and DMPA storage permitting process includes approval of the transportation of dredge spoil via pipeline to the DMPA, which the Army Corps controls given its control of the navigable waters: [9]

---

[8] US Army Corps of Engineers, ENGINEERING AND DESIGN, DREDGING AND DREDGED MATERIAL MANAGEMENT, JULY 31, 2015, EM 1110-2-5025.
[9] US Army Corps of Engineers, ENGINEERING AND DESIGN, DREDGING AND DREDGED MATERIAL MANAGEMENT, JULY 31, 2015, EM 1110-2-5025, ¶ 4.1.1.9 (c) & (d).

c. Since upland sites may be located at some distance from the dredging areas and from waterfront access, placement by direct pipeline from hydraulic dredges requires routing a pipeline to the site. Material can also be transported to an upland site using roll-off containers or by truck, but a shore-based rehandling and dewatering facility may be required.

d. Nearshore sites have waterfront access by definition. Placement by direct pipeline from hydraulic dredges is feasible if the site is located near dredging areas. Material can be transported from dredging areas to a nearshore site by barge and directly off-loaded to the site by mechanical rehandling or by hydraulic reslurry operations.

28.     The Army Corps thus has "broad regulatory authority over [confined disposal areas] through both Section 10 [of the Rivers and Harbors Act] and Section 404 [of the Clean Waters Act]. US Army Corps of Engineers, ENGINEERING AND DESIGN, DREDGING AND DREDGED MATERIAL MANAGEMENT, JULY 31, 2015, EM 1110-2-5025, ¶ 4.1.3.1.

### C. PLAINTIFF'S PETITION

29.     The Petition claims repeatedly that the Defendants "market[] and operate[] Berry Island as a Dredge Material Placement Area ("DMPA")." Pet. ¶ 46. The petition asserts claims based on the operation of the "dredge placement activities conducted on Berry Island's DMPA." *Id.* at ¶ 50. Plaintiff's petition does not explicitly mention the forgoing regulatory requirements, but references the fact that compliance with Army Corps permits for dredge placement activities conducted on Defendants property is required. See, e.g., Pet. ¶ 50.

30.     The petition claims that "from 2003 to the present" dredge placement activities have been conducted on Berry Island – which is simply to say that it has served as a permitted and licensed DMPA pursuant to numerous permits issued by the Army Corps, after extensive public hearings and comments, in none of which did the POCC ever claim to have attended to protest or request that the Army Corps conduct any investigation or request that any changes be made to the problems now alleged  to be associated with Berry Island.

31.     The petition asserts repeatedly that "the dredge placement activities on Berry Island have in the past resulted, and in the future are practically certain to result, in suspended solids and

other materials encroaching upon Plaintiff's submerged land" which adjoins Berry Island and is in the navigable waters of the Corpus Ship Channel. E. g., Pet. ¶ ¶ 50, 103, 108, 110 and 112 ("As long as Defendant Berry is allowed to conduct dredge placement activities on Berry Island, it will be practically certain that materials and substances will be discharged onto Plaintiff's submerged land."). These allegations essentially state that the Plaintiff believes discharges to be "practically certain," and the reason they know this is because they know a DMPA is designed specifically to discharge decanted sea water back into the sea, precisely as intended by the Corps and permitted so to do.

32.     The petition asserts in numerous places that "dredge pipe" has been placed on the bed of the sea. E.g., Pet. ¶ ¶ 52, 53, 105, 110 & 111. Aside from the fact that the Defendants have no control whatsoever of the laying or anchoring dredge pipe that comes into Berry Island, this complaint is simply a statement that dredging occurring in one place has to result in the removed dredge spoil going to a permitted DMPA, all of which the Army Corp approves in advance as it is the exclusive authority overseeing dredging, transportation and storage of dredge spoil.

33.     Of particular significance is the claim that Defendants have "contracted with a third party …[to] allow the third party to place hundreds of thousands of cubic yards of new dredge spoils and other materials on Berry Island's DMPA." E.g., Pet. ¶ ¶ 49, 108, 110.

34.     Attached hereto as Exhibit C is a copy of the Army Corps permit to which the petition refers.   Notably that Army Corps permit contemplates the entirety of the dredging of, transportation to and storage of all removed dredge spoil on, Berry Island and only Berry Island. The quoted portion of the permit below gives an idea of the detailed permissions in these permits, with the final sentence below containing the equally explicit requirement as to where the Army Corps will allow this dredge spoil to go:

Within the vicinity of the Berth 7 barge docks, existing bay bottom will be dredged to a depth of -15 feet mean lower low water (MLLW) with a 2-foot over dredge. For the remainder of the West Basin expansion, the proposed dredge depth will be -54 feet MLLW with a 2-foot over dredge and 2-foot advanced maintenance allowance. Turbidity curtains will be utilized during dredging operations to minimize any impacts to adjacent seagrasses, and dredged material will be placed in designated material placement areas. To stabilize the dredge side slope, the project will install approximately 1,350 linear feet of 44-foot-wide articulated block mattress. The condition of the dredge slope and block mattresses will be monitored for a period of five years by conducting annual hydrographic surveys of the basin. The overall dredge footprint will be approximately 43 acres including side slopes, of which 32.8 acres will be at the proposed finished depth. Navigational aids will be installed to mark the limits of the basin and prevent vessels from disturbing nearby seagrass area during operational movements. **All dredged material will be placed on Berry Island.**

### III.

### REMOVAL IS PROPER UNDER 28 U.S.C §§ 1331 AND 1441(a) BECAUSE THE PETITION ALLEGES CLAIMS THAT "ARISE UNDER" FEDERAL LAWS AND REGULATIONS

35.     Plaintiff's quarrel is not truly with the Defendants. Rather it is with the Army Corps, who pursuant to its extensive permitting process, approved the activities about which Plaintiff complains. Furthermore, the issuance of the permit is such that the activities therein specified cannot be changed without Army Corps approval; neither can they be abandoned without Army Corps approval. The applicable Rivers and Harbors Act of 1989, 33 U.S.C. §§ 401-467; the Clean Water Act of 1972, 33 U.S.C. §§ 1251-1388; as well as comprehensive federal regulations discussed herein, have already been recognized by the Fifth Circuit as well satisfying the "substantiality" requirement to mandate removal:

> The district court concluded that the substantiality requirement was met in this case, both because the relevant federal statutes plainly regulate "issues of national concern" and because the case affects "an entire industry" rather than a few parties. Moreover, it called the lawsuit "a collateral attack on an entire regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." … The dispute between the parties does not just concern whether Defendants breached duties created by federal law; it concerns whether federal law creates such duties. As Defendants point out, the validity of the Board's claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law. The implications for the federal regulatory scheme of the sort of holding that the Board seeks would be significant, and thus the issues are substantial.

*Bd. of Comm'rs v. Tenn. Gas Pipeline Co.,* 850 F.3d 714, 724 (5th Cir. 2017).

36.     Indeed, it is the federal law, as administered by the Army Corps, that establishes standards of conduct and operation – standards that cannot be altered or abandoned without the permission of the Army Corps.

37.     Given the unique situation here involving U.S. navigable waters and the extensive regulatory scheme for regulating dredging in all its components – including disposal of the dredge spoil generated – there is no chance that removal of this case would in any way constitute an "enormous shift" of traditionally state cases into federal courts were removal here to be accepted.

38.     In fact, while the POCC claims its interests in the submerged lands associated with the Corpus Christi Ship Channel give rise to a property right, that claim is likely unfounded.  First, as noted and perhaps even the POCC will concede, the Army Corps retains control of all navigable waters and this includes the submerged lands as well.  But even more fundamentally the Texas Supreme Court has cast grave doubt on the validity of the POCC's claimed "property rights."  In *Chambers—Liberty Ctys. Navigation Dist. v. State,* 575 S.W.3d 339, 341 (Tex. 2019), a navigation district like the POCC claimed to have been deeded subsurface lands, just as POCC claims here. The navigation district took the position that because of this property right, it alone had the right to grant leases to harvest oysters lying on the bottom or the subsurface – or as the navigation district there trumpeted, on "their land." The Texas Supreme Court pointed out that while it was true that a navigation district could own land, its ownership must still be subject to its purpose:  navigation. The Supreme Court held:

> … that general authority to lease land is not a license to enter into any lease imaginable. As with any other activity it undertakes, the District may exercise its authority to lease land only when doing so is consistent with its limited statutory purposes "conferred by law." Tex. Const. art XVI, § 59(b).

*Chambers—Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 351 (Tex. 2019).

39.     When the Navigation District protested that it could own property just like other private landowners, the Supreme Court said that was not accurate because the navigation district there, like the POCC here, is the **government**, not a **private citizen**:

> The Commissioners and STORM contend that the District's ownership of the submerged lands in fee simple gives it a property right to lease its land free from the Department's interference. They argue that the District's alleged right to lease its submerged land for oyster cultivation, even though the State regulates the oysters, is like the right of a rancher to lease his land for deer hunting even though the State regulates the wild deer. STORM, in particular, contends that if the District cannot lease its submerged land as it wishes, then no landowner is safe from the Parks and Wildlife Department's interference with property rights. **This line of argument is specious. The District is not a private property owner. It is the government. This case has nothing to do with private property rights. The only real estate at issue is public**.

*Chambers—Liberty,* 575 S.W.3d at 353 (emphasis added).

40.     Again, there is no conceivable way a federal court exercising jurisdiction here could "open up the floodgates" for state claims of others.

**IV.**

**REMOVAL IS PROPER UNDER 28 U.S.C §§ 1331 AND 1441(a) BECAUSE THE PETITION ALLEGES CLAIMS THAT "ARISE UNDER" FEDERAL LAWS AND REGULATIONS PARTICULARLY IN THAT INJUNCTIVE RELIEF POCC SEEKS WOULD MAKE THE POCC THE JUDGE OVER THE ARMY CORP'S PERMITTING**

41.     Plaintiff's petition makes clear that a large part of the relief they seek is injunctive relief

> prohibiting Defendant Berry his officers, partners, agents, servants, employees, and those acting in concert with them from, in the course of any dredge material placement activities on Berry Island, causing, commanding, allowing, requesting, instructing, or otherwise permitting: (i) the discharge of any materials or substances from Berry Island that settle upon Plaintiff's submerged land; (ii) the placement of rip rap[10] on Plaintiff's submerged land; or (iii) the placement or anchoring of dredge pipe upon Plaintiff's submerged land."

Pet. ¶ 115.

---

[10] "Rip rap" is merely stones placed to keep waves from the Corpus Ship Channel from washing onto Berry Island and eroding the soil on Berry Island. And it is all located on the property of Berry Island.

42.     This request, one of many in the petition, is prefaced with the assertion that as long as Defendants are "allowed to conduct dredge placement activities on Berry Island, it will be practically certain that materials and substances will be discharged onto Plaintiff's submerged land."  Pet. ¶ 112.

43.     The only reason that the Plaintiff can say that continued operations of a DMPA on Berry Island "will be practically certain" to discharge anything into navigable waters," is because the Plaintiff itself is the owner of the overwhelming majority of the other DMPA's in the entire area.  The following picture put forth by the Plaintiff itself in late 2019 shows the huge number of DMPA's it owns in the precise area:



44.     Berry Island, circled in red, is dwarfed by the POCC's competitive DMPA facilities. So the Plaintiff understands full well that an injunction as it requests, if granted, would mean that the entire dredging project on Berry Island may have to close if an injunction is entered, which "coincidentally" would mean the Plaintiff, under the banner of a governmental agency but in reality a naked commercial competitor, would then be in a position to lobby for the business otherwise permitted for Berry Island.

45.     Aside from the obvious bad faith, anticompetitive motives, the request to enjoin the lawful activities that the Plaintiff's petition itself acknowledges has occurred, is nothing less than allowing the POCC to set itself up as the gatekeeper of and judge over, the Army Corps.  This is a massive disruption of the regulatory scheme Congress has put in place.  Clearly substantial federal questions and issues abound having nothing to do with state causes of action or remedies.

**V.**

**REMOVAL IS PROPER UNDER 28 U.S.C §§ 1331 AND 1441(a) BECAUSE THE PETITION ALLEGES CLAIMS THAT "ARISE UNDER" FEDERAL LAWS AND REGULATIONS PARTICULARLY IN THAT RECTIFICATION OF THE "DAMAGE" WILL INVOLVE EXTENSIVE WORK IN THE NAVIGABLE WATERS OF THE CORPUS SHIP CHANNEL, WHICH WILL HAVE TO BE APPROVED BY THE ARMY CORPS, WHO APPROVED THE COMPLAINED OF ACTIVITIES IN THE FIRST PLACE**

46.     Pet. ¶ 106 also asks for damages " including but not limited to the cost to restore Plaintiff's property."   But for this Court to consider such relief, the Army Corps would have to approve it, as they maintain absolute control over all dredging and dredge spoil placement.  And they would thus be "restoring" all of the activities that they had approved.   This is a point that mandates removal as the Fifth Circuit observed, when in *Bd. of Commissioners*, it noted that the plaintiff there was seeking a remedy in the form of damages to backfilling canals, "that could not be required under any state law-based conception of negligence, and accordingly the claim of necessity has a 'federal substance.'"  *Bd. of Comm'rs*, 850 F.3d at 722.  Such is the case here. Because only the Army Corps can authorize dredging and the movement of dredge spoils, the very remedy the Plaintiff seeks makes the issue one of "federal substance," and thus removal is appropriate.

**VI.**

**REMOVAL IS PROPER UNDER 28 U.S.C §§ 1331 AND 1441(a) BECAUSE THE PETITION ASSERTS GENERAL MARITIME CLAIMS**

47.    "A federal court's authority to hear cases in admiralty flows initially from the Constitution, which "extend[s] federal judicial power to all Cases of admiralty and maritime Jurisdiction." U.S. Const., Art. III,§ 2; see also J*erome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995). "Congress has embodied that power in a statute giving federal district courts 'original jurisdiction ...of [a]ny civil case of admiralty or maritime jurisdiction ... .'" 28 U.S.C. § 1333(1); see also *Grubart*, 513 U.S. at 531.

48.    A party seeking to invoke federal admiralty jurisdiction under 28 U.S.C. § 1333(1) over a tort claim "must satisfy conditions both of location and of connection with maritime activity." *Grubart*, 513 U.S. at 534. In applying the location test, a court "must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* at 534 (citing 46 U.S.C. App. § 740 (now 46 U.S.C. § 30101)). In applying the connection test, a court must first assess the "general features of the type of incident involved" to determine if the incident has "a potentially disruptive impact on maritime commerce," and then determine whether the character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. *Grubart*, 513 U.S. at 534.

49.    Both tests are easily satisfied here. The petition repeatedly alleges that the "tortious" actions complained of, allegedly occurred and continue to occur on navigable waters resulting from dredging work on navigable waters where the resulting dredge spoil is transported through navigable waters to the Defendants' permitted Dredge Material Placement Area where the effluents alleged to be discharge back into the navigable waters.  Furthermore, this is allegedly damaging Plaintiff's subsurface property which located in navigable, maritime waters.

50.    For these reasons, Plaintiff's claims sound in maritime tort, *Grubart*, 513 U.S. at 534, and this lawsuit is a case of Admiralty and Maritime Jurisdiction arising under Article III,

section 2 of the United States Constitution, 28 U.S.C. § 1333, 46 U.S.C. § 30101, and Rule 9(h) of the Federal Rules of Civil Procedure.

51.    Before January 2012, courts interpreted 28 U.S.C. § 1441(a) to mean that a general maritime claim could be removed only when there was a separate basis for federal jurisdiction. But 28 U.S.C. § 1441 was amended in 2011 as a part of the Federal Courts Jurisdiction and Venue Clarification Act of 2011, H.R. 394, P.L. 112-63. The amendment removed the language in section 1441(a) that had been interpreted as barring removal of federal maritime cases. *See Ryan v. Hercules Offshore, Inc.*, No. H-12-3510, 2013 WL 1967315 (S.D. Tex. May 13, 2013); *Wells v. Abe's Boat Rentals Inc.*, No. H-13-1112, 2013 WL 3110322 (S.D. Tex. 2013).

52.    Section 1441(a) currently states: "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." Accordingly, the case is removable because it asserts general maritime claims.

## VII.
## REMOVAL IS PROPER UNDER 28 U.S.C §§ 1331 AND 1441(a) BECAUSE OTHER THAN THE AFOREDISCUSSED MARITIME CLAIMS, THE ONLY OTHER CLAIM IS ONE FOR TRADEMARK INFRINGEMENT WHICH CLAIM NO LONGER EXISTS OR AT THE MOST IS A TRIVIAL CLAIM

53.    As noted, from its initial filing in April 2018, the POCC's complaint has only been about the fact that in 2014 the Entity Defendant filed a Certificate of Formation with the Texas Secretary of State using a name that the POCC, a governmental navigation district, claimed "unfairly competed" with them.  However,  the Entity Defendant has long since changed its name and abandoned its use, a fact the petition itself acknowledges.  Pet. ¶ 40.  Hence this claim is moot.

54.     In *Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 227-30 (Tex. 1993) an adoption agency run by the Presbyterian Church declined employment to an applicant of a different faith. The adoption agency was sued by both the denied applicant and the Texas Commission on Human Rights.  The adoption agency prevailed at the trial court and the court of appeals affirmed the judgment of the trial court.  *Id*. at 228.  When the case arrived at the Supreme Court, the adoption agency advised that it had ceased offering adoption services and had abolished the position which the applicant had sought.  Based on this, the Supreme Court of Texas"…without reference to the merits, …vacate[d] the judgment of the court of appeals and of the trial court and dismiss[ed] this case as moot." *Id*.  Notably, the unilateral act of the adoption agency ceasing the complained of controversy and thus mooting the entire case is no different from the Entity Defendant changing its name and abandoning it thus mooting the issue.

55.     As such, this claim – which is the only other one asserted – is nonexistent, or at the very most inconsequential. In short, federal questions are the only true questions with which Plaintiff's petition deals.

WHEREFORE, Defendants pray that further proceedings in County Court At Law No. 4 in Nueces County be discontinued and that this action be recognized as removed to and pending on the docket of the United States District Court for the Southern District of Texas, Corpus Division, as the law in such cases provides.

Respectfully submitted,

 /s/ Shelby A. Jordan
Shelby A. Jordan
State Bar # 11016700
Antonio Ortiz
State Bar # 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas 78401

Telephone:   (361) 884-5678
Telecopier:   (361) 888-5555
Email:  aortiz@jhwclaw.com
Email:  sjordan@jhwclaw.com
Copy to: cmadden@jhwclaw.com
***ATTORNEYS FOR THE PORT OF CORPUS CHRISTI, LP***

/s/ *Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
**BROOCKS LAW FIRM P.L.L.C.**
6207 Bee Caves Rd. Suite 102
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
***CO-COUNSEL AND ATTORNEY FOR THE PORT OF CORPUS CHRISTI, LP***

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of February, 2022, a true and correct copy of the foregoing was served on the parties listed below via ECF electronic filing.

Earnest W. Wotring
John Muir
David George
Debra Tsuchiyama Baker
**BAKER •WOTRING LLP**
700 JPMorgan Chase Tower
600 Travis
Houston, Texas 77002
ewotring@bakerwotring.com
jmuir@bakerwotring.com
dgeorge@bakerwotring.com
dbaker@bakerwotring.com

Barrett H. Reasoner
Ashley M. Kleber
Gabriel Kaim
Caitlin Halpern
**GIBBS&BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, TX 77002
breasoner@gibbsbruns.com

akleber@gibbsbruns.com
gkaim@gibbsbruns.com
chalpern@gibbsbruns.com

Douglas A. Allison
403 N. Tancahua St.
Corpus Christi, TX 78401
doug@dallisonlaw.com

Macey Reasoner Stokes
Travis L. Gray
BAKER BOTTS LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
macey.stokes@bakerbotts.com
travis.gray@bakerbotts.com

*/s/ Shelby A. Jordan*
Shelby A. Jordan